UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph H. Rodriguez |
| | : | Criminal No. 20-68 |
| v. | : | |
| | : | **OPINION** |
| SERCAN OYUNTUR | : | |

On the third day of his criminal trial—which resulted in convictions on all six counts charged—Defendant Sercan Oyuntur ("Defendant") announced that the United States of America (the "Government") produced new discovery information the night before. Defendant moved for a mistrial, arguing that this delayed production violated his due process rights under *Brady v. Maryland*. For the reasons discussed below, the Court will deny Defendant's motion.

### I. Background

The Government charged Defendant in a six-count indictment[1] ("the Indictment") for his role in a 2018 conspiracy (the "Conspiracy") to siphon more than $23 million in Department of Defense ("DOD") funds from S-Oil, an unsuspecting DOD contractor. [Dkt. 23]. The Indictment alleged that Defendant's coconspirators, Hurriyet Arslan ("Arslan"),[2] Metin Koros ("Koros"),[3] and others, used an email phishing scheme to obtain login credentials for S-Oil's

---

[1] The Indictment charged Defendant with conspiracy to commit bank, mail and wire fraud, in violation of 18 U.S.C. § 1349; two counts of bank fraud, in violation of 18 U.S.C. § 1344; using one or more unauthorized access devices to commit fraud, in violation of 18 U.S.C. § 1029; aggravated identity theft, in violation of 18 U.S.C. § 1028A; and making false and fraudulent statements, in violation of 18 U.S.C. § 1001.

[2] Arslan pleaded guilty for his role in the Conspiracy and testified at trial on April 28 and 29, 2022.

[3] Koros is believed to reside in Germany and is not in the Government's custody.

System for Award Management ("SAM") account.[4]  Arslan also recruited an unsuspecting witness to provide a power of attorney authorizing Arslan to open a company, Global Trac World LLC ("Global Trac"), and a bank account for Global Trac on her behalf.  Defendant's coconspirators then changed the bank account information in S-Oil's SAM account to include the Global Trac bank account.

Later, Defendant received the stolen S-Oil credentials from his coconspirators, called the DOD, and used these credentials to represent himself as an authorized user of S-Oil's SAM account.  Defendant asked DOD staff to change the bank account listed in S-Oil's SAM account to a bank account affiliated with Deal Automotive Sales, LLC ("Deal Automotive"), a company that Arslan owned.  Following this change, the DOD transferred more than $23 million to Deal Automotive's bank account instead of S-Oil's.  Defendant then helped to fabricate documents to convince Deal Automotive's bank to release the diverted funds.  Defendant also denied knowing Arslan when investigators questioned Defendant at his home when investigating the misappropriation of the $23 million.  After a six-day trial, a unanimous jury convicted Defendant on all six counts for his role in the Conspiracy.  [Dkt. 86].

On the second night of trial, April 20, 2022, the Government produced a redacted Department of Homeland Security ("DHS") report "approved" on April 23, 2014 (the "2014 Report") as discovery material.  The 2014 Report discusses a DHS investigation into a scheme to export stolen cars to Liberia.  The 2014 Report indicates that DHS commenced its investigation

---

[4] SAM is the digital portal where contractors who do business with the DOD input bank account and other information that the DOD uses when paying its contractors.

after receiving information from New Jersey state authorities about the illegal export of stolen cars.[5]

One subject of this investigation, Cheryl Marsh, testified as a Government witness in this case on April 25, 2022 because she registered Global Trac for Arslan. Marsh owns Marsh & Associates, a company that helps small business owners to register their businesses. Marsh and Arslan were introduced around 2014 by one of Marsh's clients who was involved in automobile exports. [Dkt. 70, Trial Tr. 572:19–573:2; 589:13–590:4]. Since then, Marsh has helped Arslan to register several businesses, including Global Trac and SMM Steel, an entity which the Court will discuss more below. [Dkt. 73, Trial Tr. 739:11–740:19]. Marsh stated that she believed Arslan's businesses involved selling used cars and parts. [Dkt. 70, Trial Tr. 591:16–19].

The morning after Defendant received the 2014 Report, Defendant moved for a mistrial, arguing that the Government violated its discovery obligations under *Brady v. Maryland* by failing to turn over the 2014 Report sooner. Defendant argued that the Government's failure to disclose the 2014 Report earlier affected the case in the following ways:

> 1. It changed Defendant's understanding of Marsh's role in this case from an "unsuspecting individual who Mr. Arslan asked to incorporate businesses for him" to someone who has been "illegally exporting stolen vehicles" since 2014. Recall that Arslan and Marsh met in 2014, Arslan sold used cars, the mutual acquaintance who introduced them was involved in shipping cars overseas, and the 2014 Report describes Marsh's apparent involvement in a scheme to export stolen used cars.
>
> 2. It prevented Defendant from investigating the information contained in the 2014 Report, including by identifying and contacting the people who "tipped off" DHS, questioning Marsh about her involvement with Arslan and

---

[5] The Government provided an unredacted copy of the April 2014 Report to the Court for review. For additional context, the Government provided to the Court a second DHS report approved on September 2, 2015; a January 30, 2014 report from the Mercer County Prosecutor's Office; and a July 15, 2014 report from the Mercer County Prosecutor's Office. These reports concern state and federal investigations into used car theft and exportation to Liberia.

        knowledge of his illicit business, cross-checking the individuals named in the 2014 Report with the individuals involved in the Conspiracy, and requesting additional discovery from the Government.

3. It changed Defendant's view of Arslan's "position" in this case in that it suggests a longer track record of criminal activity.

4. It impacted Defendant's case preparation and opening statement. It also affected the "cross-examination of witnesses who are yet to testify and witnesses who have already testified about their failure to investigate" the illegal car business while investigating this case.

[Dkt. 69, Trial Tr. 403:15–408:18].

The Government opposed the motion arguing that the timing of the Government's disclosure was proper. The Government argued that the 2014 Report could not "exculpate" Defendant even if it spoke to Marsh's criminality. The Government also represented that New Jersey state authorities brought charges against Marsh for her Role in illegally exporting cars as described in the 2014 Report[6] but eventually dropped those charges. The Government did not bring federal charges against Marsh. [Dkt. 69, Trial Tr. 419:19–420:3].

The Court reserved its ruling on Defendant's motion until the end of trial to fully understand the impact that the 2014 Report might have on the case.

## II. Legal Standard

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment." 373 U.S. 83, 87 (1963). To establish a due process violation under *Brady* that warrants a mistrial, a defendant must show that "(1) the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) the

---

[6] The July 15, 2014 Mercer County Prosecutor's Office report indicates that county authorities arrested Marsh and processed her for receiving stolen property, fencing, and falsifying records.

4

prosecution withheld it; and (3) the defendant was prejudiced because the evidence was "material." *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (citations and quotations omitted).

### III. Analysis

The Court will assume without deciding that the 2014 Report would have been "favorable" to Defendant and limit its discussion to elements (2) and (3). For the reasons discussed below, the Court finds that Defendant's *Brady* motion fails on both elements.

#### a. Suppression

Defendant grounds his *Brady* motion in information that the Government produced during trial, and not in evidence that the Government failed to disclose altogether. Thus, the Court must determine whether the Government "suppressed" evidence by producing the 2014 Report when it did.

The Government "suppresses" evidence if it fails to produce evidence before a trial concludes or fails to produce evidence "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (citations omitted); *accord United States v. Alvin*, 30 F. Supp. 3d 323, 334 (E.D. Pa. 2014) (citing *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)); 9A Fed. Proc., L. Ed. § 22:1275 ("If the defendant receives the material in time to put it to effective use at trial, his or her conviction will not be reversed simply because the material was not disclosed as early as it should have been."). When the evidence at issue is impeachment evidence, a defendant's due process rights are "fully protected if disclosure is made the day that [a] witness testifies" because "[d]isclosure at that time will fully allow [defendants] to effectively use that information to challenge the veracity of the government's witnesses." *Higgs*, 713 F.2d at 44.

Defendant appears to have argued that the Government's late disclosure of the 2014 Report prevented Defendant from effectively using the 2014 Report at trial substantively and for impeachment.  Substantively, Defendant argued that the timing of the Government's production affected counsel's ability to prepare the defense.  Defendant was unable to fully investigate the conduct and information described in the 2014 Report or explore any overlap between the individuals identified in the 2014 Report and the Conspiracy.  Further, Defendant argued that counsel would have presented a different opening statement based on the information contained in the 2014 Report.  With respect to impeachment, Defendant argued that counsel would have cross-examined witnesses and prepared for cross-examinations differently.  The Court rejects these arguments.

Defendant's argument that he suffered a due process violation because he was unable to investigate the information in the 2014 Report and the relationship between Marsh and Arslan is meritless.  "[T]o establish a Brady violation by arguing that suppressed evidence would have led to additional exculpatory materials … [a] defendant must … produce some evidence to show that his investigation would have borne fruit."  *Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 116 (3d Cir. 2010) (citing *United States v. Agurs*, 427 U.S. 97, 1109–10 (1976)).  Defendant offered no such evidence, and even acknowledged that "we don't know what this investigation would have been able to unfurl."  [Dkt. 69, Trial Tr. 415:18–19].  The investigation may have proven fruitless because, as the Government pointed out, "no one is required to talk to an investigator."  [Dkt. 69, Trial Tr. 413:2–5].  Defendant's argument that he would have uncovered additional evidence is therefore purely "speculative," which is insufficient to establish a *Brady* violation.  *Maynard*, 392 Fed. App'x at 116.  Moreover, and as explained more fully below, Defendant's proposed investigation would have focused on Marsh's and Arslan's conduct

6

apart from the Conspiracy,[7] which has no bearing on Defendant's conduct or state of mind. So even if the 2014 Report gave Defendant reason to pursue different lines of investigation Defendant has failed to show that he would have obtained evidence that could have called his guilt into question. *See United States v. Hill*, 976 F.2d 132, 134–35 (3d Cir. 1992).

Defendant's argument that he would have pursued different trial strategies and used a different opening argument fails for the same reason. Again, a defendant must show that the trial strategies that defendant had to abandon would have called "the outcome of the trial into question." *Maynard*, 392 Fed. App'x at 115 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Defendant argued that his trial strategy would have been different, but failed to identify any specific differences or explain how they might have lead to a different outcome.

The Court also rejects Defendant's argument that the Government suppressed the 2014 Report as impeachment evidence. The Government produced the 2014 Report before Marsh and Arslan—the two witnesses who, according to Defendant, are implicated in the 2014 Report—testified at trial. The Government therefore did not deprive Defendant of the 2014 Report's impeachment value as to Marsh and Arslan. *See Higgs*, 713 F.2d at 43–44.

Although numerous witnesses had testified by the time Defendant received the 2014 Report, the timing of the Government's disclosure did not affect Defendant's cross examination of most of those witnesses. All but two of the witnesses who had already testified were minor witnesses, including DOD employees who performed technical and/or administrative duties.

---

[7] [*E.g.* Dkt. 69, Trial Tr. 406:15–20 ("Additionally, a lot of the information in this report about who sort of tipped off Homeland Security to this activity and to these concerns is redacted out. Had I had this previously, again, it's someone that I would have wanted to interview to see if they knew anything about Hurriyet Arslan; what exactly they knew about Ms. Marsh, who she was sending these vehicles to, how she knew to do these things, who her contacts were, where the vehicles came from.")].

[*See* Dkt. 75–76].  Another witness was a translator hired to translate pieces of evidence from Turkish to English.  [Dkt. 75, Trial Tr. 134–38].  These witnesses did not investigate the Conspiracy and had limited knowledge—if any—of the Conspiracy's members or objectives.  Indeed, Defendant's cross examination of several of these witnesses effectively highlighted how little these witnesses knew about Defendant and his coconspirators' activities.  [*E.g.* Dkt. 76, Trial Tr. 180:22–182:7].  The Court does not see how Defendant could have used additional information about Marsh's and/or Arslan's illicit activities beyond those identified in the Indictment to impeach these witnesses on cross examination.

Only two other witnesses potentially implicate Defendant's right to timely impeachment evidence under *Brady*, but the Government met its obligations as to these witnesses.  As noted, Defendant allegedly sought to impeach the Government about its failure to investigate the information in the 2014 Report.  One witness, James Femino ("Femino"), investigated this case as a Special Agent with the Office of the Inspector General for the General Services Administration.[8]  Femino first testified on April 19, 2022, one day before the Government produced the 2014 Report.  But the Government recalled Femino to testify a second time on April 26, 2022, so Defendant could have used the 2014 Report to cross examine Femino at that time.  *United States v. Zayas*, No. 20-1265, 2022 WL 1180609, at *13 (3d Cir. Apr. 21, 2022) ("To the extent that the government delayed disclosure of [*Brady* evidence, the Defense] was nevertheless able to use that information.").  Even with the 2014 Report in hand, Defendant did not interrogate Femino's knowledge of or failure to investigate a scheme to export stolen cars.

---

[8] As noted above, Defendant argued that he was unable to cross examine Government witnesses about their failure to investigate Marsh's potential involvement in the Conspiracy, and Marsh's and Arslan's criminal activities not identified in the Indictment.

8

Nor did Defendant inquire about Femino's knowledge of or failure to investigate Marsh's role in the Conspiracy or her involvement in Arslan's other criminal conduct. In this context, the Court does not see how the Government's failure to produce the 2014 Report before Femino testified the first time impaired Defendant's ability to impeach Femino when he testified again one week later.

Similarly, the Government did not violate Defendant's due process rights as to Melissa Gibson's ("Gibson") testimony. Gibson is a Special Agent assigned to the United States Attorney's Office in the District of New Jersey who partnered with Femino to investigate this case. Gibson's direct examination began on April 20, 2022 and continued into April 21, 2022. The Government produced the 2014 Report on the evening of April 20, 2022, which gave Defendant the opportunity to cross examine Gibson based on the 2014 Report on April 21, 2022. *Higgs*, 713 F.2d at 43–44; *see also United States v. Shifflett*, 798 F. Supp. 354, 356 (W.D. Va. 1992) ("[T]he government need not disclose the criminal records of its witnesses to the defense until after the witnesses testify on direct examination at trial.").

In sum, the Court finds that the Government produced the 2014 Report in time for Defendant to effectively use it at trial and, therefore, did not "suppress" the 2014 Report. As a result, no due process violation under *Brady* occurred.

### b. Materiality

Even if the Government "suppressed" the 2014 Report, the suppression did not cause a due process violation because the suppressed information was not material.

To show that undisclosed information is "material," a defendant must establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citations

and quotations omitted). "Materials that must be disclosed are those that go the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *Hill*, 976 F.2d at 134–35 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Courts must weigh the suppressed evidence against the evidence presented at trial to determine whether there is a "reasonable probability" that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013) (quoting *Bagley*, 473 U.S. at 682).

The evidence at issue here is not material because it is peripheral at best and does not strike at the "heart" of Defendant's guilt or innocence. *Hill*, 976 F.2d at 134–35. There was no meaningful dispute in this case as to Defendant's conduct, and Defendant did not argue that the 2014 Report casts doubt on Defendant's conduct. The key issue was the Defendant's state of mind when he engaged in this conduct, as Defendant recognized.[9] But the 2014 Report did not discuss or refer to Defendant at all. The 2014 Report potentially implicated Arslan and Marsh in an unlawful scheme to export stolen cars to Africa, and may have suggested more generally that Arslan and Marsh collaborated to commit crimes. But the Court does not see how Arslan and/or Marsh having a more extensive history of criminal conduct than previously understood could by itself impact a jury's determination of Defendant's state of mind. Likewise, Defendant did not convincingly argue or explain how the Government's failure to investigate illegal car exports from 2014 could have impacted the jury's view of Defendant's role in a 2018 conspiracy to

---

[9] [Dkt. 73, Trial Tr. 843:2–10 ("Your Honor, looking at the conspiracy count, and really all of the counts, there is an element of mens rea to each and every count which deals with the knowledge of the defendant as to the criminal intent of the scheme and his own belief that he was engaging in criminal activities to commit fraud. … [A]s Your Honor stated earlier, that's really the element that's at issue.")].

misappropriate DOD funds. When considered in the context of the full record, the 2014 Report is "too little, too weak, [and] too distant from the main evidentiary points to meet *Brady*'s standards." *Turner v. United States*, 137 S. Ct. 1885, 1894 (2017).

Defendant argued that the 2014 Report and the information that may have been recovered from further investigation were material because they might have bolstered the primary defense theory that "Mr. Oyuntur was just a pawn in this case" and that Arslan, Koros, and other coconspirators "didn't need [Defendant] for anything other than to cover up." [Dkt. 69, 416:6–8]. As decided above, Defendant's argument concerning the information that might have been recovered through further investigation is speculative, therefore, meritless. *Maynard*, 392 Fed. App'x at 116. And nothing in the 2014 Report itself—which discusses a 2014 scheme to export stolen cars—speaks to whether Defendant was an unsuspecting "pawn" in the Conspiracy. But even if Defendant did investigate and the investigation demonstrated that Marsh helped to export stolen vehicles, the Court does still does not see a logical connection between the export scheme and this Defense theory. And even if this investigation also demonstrated that Marsh knowingly participated in the Conspiracy at issue here, it is unclear how adding Marsh's name to the list of coconspirators could have changed the jury's view of Defendant's conduct and state of mind. No evidence at trial suggested that Marsh knew of or interacted with Defendant during the course of the Conspiracy, or had any role in Defendant's participation in the Conspiracy. Thus, there is nothing in the 2014 Report that could "undermine confidence in the outcome" of this trial. *Bagley*, 473 U.S. at 682 (citations and quotations omitted).

The Court also finds that the 2014 Report could not have "affect[ed] the jury's judgment of the credibility of a crucial prosecution witness," even if Defendant could not use the 2014 Report to cross examine witnesses. *Hill*, 976 F.2d at 134–35 (citations and quotations omitted).

11

If any witnesses were "crucial" in this case, they were Arslan, Femino, and Gibson.[10] The 2014 Report did not identify Arslan as a participant in the scheme to export stolen cars, did not suggest that Arslan was prosecuted for his involvement in this scheme, and therefore does not constitute a "criminal record" that could be used to undermine his credibility. *See United States v. Perdomo*, 929 F.2d 967, 972 (3d Cir. 1991) (holding that the state's failure to disclose a key prosecution witness's history of criminal convictions at trial constituted a *Brady* violation). Thus, at most, the 2014 Report would have provided circumstantial impeachment evidence that Arslan may have participated in a scheme to export stolen cars four years before the Conspiracy, and that Marsh was a longstanding partner in crime.

But such impeachment evidence would have been "superfluous" to the other evidence presented at trial concerning Arslan's criminal activities.[11] The jury heard testimony from

---

[10] In the Court's view, Marsh was not a prosecution witness "crucial" to the Government's case, Defendant's defenses, or the jury's determination of guilt. Marsh testified primarily about her past interactions with Arslan and the process of registering Global Trac for Arslan. Marsh did not testify on direct or cross examination about Defendant's conduct or indicate that she ever knew of or interacted with Defendant. Her direct examination and cross examination were relatively brief. Further, nothing at trial suggested that the evidence that the Government gathered in this case—and which provided the basis for Defendant's conviction—implicated Marsh in Defendant's conduct. So even if the 2014 Report caused the jury to view Marsh as a criminal and/or as a participant in the Conspiracy, this revised view of Marsh could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

[11] *See United States v. Walker*, 657 F.3d 160, 186 (3d Cir. 2011) ("While we have recognized that undisclosed *Brady* material that would have provided a different avenue of impeachment is material, even where the witness is otherwise impeached, impeachment evidence, if cumulative of similar impeachment evidence used at trial ... is superfluous and therefore has little, if any, probative value." (cleaned up) (citations and quotations omitted)); *see also Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 300 (3d Cir. 2016) (noting that a *Brady* violation may occur where a "significant difference" exists "between the suppressed impeachment and other types of impeachment evidence used at trial." (citing *Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004))).

Femino that Arslan previously diverted DOD funds into his SMM Steel bank account by manipulating the SAM accounts of other government contractors.[12] The jury also learned that the Government charged Arslan for his role in the Conspiracy and that Arslan pleaded guilty to "one or more" of these charges. [Dkt. 73, Trial Tr. 728:6–18]. Thus, even assuming that Arslan was involved in a scheme to export stolen cars in 2014, that evidence of this involvement came to light, and that Defendant would have questioned Defendant about this conduct, the evidence of Arslan's involvement in an stolen car scheme would have done little if anything to further impeach Arslan's credibility.

Likewise, nothing in the 2014 Report could have impaired Femino's or Gibson's credibility. Defendant claimed that counsel would have used the 2014 Report to attack Femino's and Gibson's credibility based on their failure to investigate Marsh's role in the Conspiracy and/or Arslan's potential involvement in the stolen car export business discussed in the 2014 Report. But it is unclear how Femino's and Gibson's purported failure to investigate a car export scheme from 2014 would cast doubt on the evidence that they *did* recover during their investigation and their testimony about this evidence. Even if Femino and Gibson could be impeached for failing to fully explore Marsh's and Arslan's illegal conduct, such impeachment would not call Defendant's conduct or state of mind into question. *Cf. Kyles*, 514 U.S. at 442–

---

[12] On cross examination, Femino testified that the Government identified a bank account for SMM Steel—another entity that Arslan owned and Marsh registered—as a "bad actor" account in the SAM database. Femino testified that the SMM Steel bank account was improperly "associated" with hundreds of SAM user accounts and received DOD funds through SAM. [Dkt. 73, Trial Tr. 802:5–803:7]. Femino also testified that Arslan and Koros were "involved" in this scheme to register SMM Steel's bank account with other entities in the SAM database to obtain DOD funds. [*See* Dkt. 73, Trial Tr. 803:21–24]. In closing arguments, Defendant pointed to this testimony to suggest that Defendant was an oblivious pawn in Arslan and Koros's broader scheme to steal funds through the SAM database. Defendant argued that Arslan and Koros could have and would have stolen S-Oil's funds even without Defendant's participation. [*See* Dkt. 74, Trial Tr. 904:19–907:16].

43, 442 n.12 (finding a *Brady* violation where suppression of evidence foreclosed impeachment of the police's "shoddy" murder investigation. The prosecution suppressed one witness's contemporaneous physical description of the suspect, and failed to disclose that another witness who fit that description had pending charges for armed robbery where the murder occurred and was under investigation for involvement in another murder).

Ultimately, even after assuming that the Government suppressed the 2014 Report and that the 2014 Report inculpated Marsh and Arslan, the Court does not see how the 2014 Report could have exculpated Defendant. Likewise, assuming that the Government failed to fully investigate Marsh and Arslan's criminal conduct based on the 2014 Report, the Court does not see how the inability to impeach Femino and Gibson for this failure "undermine[s] confidence in the [jury's] verdict." *Kyles*, 514 U.S. at 435. The Court therefore concludes that the 2014 Report was not material under *Brady*.

### IV.   Conclusion

For the reasons discussed above, the Court finds that the Government did not violate Defendant's due process rights under *Brady*, and will deny Defendant's motion for a mistrial. An appropriate order will follow.

May 11, 2022                                                                  /s/ Joseph H. Rodriguez

                                                                              Hon. Joseph H. Rodriguez, USDJ